(158 P.3d 330)
No. 94,797

STATE OF KANSAS, *Appellee,* v. PAUL ROBERT DAYHUFF,
*Appellant.*

780

Opinion filed May 18, 2007.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Jennifer Brunetti*, special prosecutor, *Steven W. Wilhoft*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before MCANANY, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Paul Robert Dayhuff appeals his jury trial conviction and sentence for aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A). First, Dayhuff argues that he was denied his right to a unanimous verdict because the prosecutor relied on acts not charged in the complaint to obtain his conviction. Nevertheless, the jury in this case was properly instructed on the elements of the charged crime. Moreover, the State never argued to the jury that uncharged acts could provide a basis for Dayhuff's conviction. Further, the jury was properly instructed on juror unanimity in a multiple acts case. Therefore, Dayhuff's argument fails.

Next, Dayhuff argues that his right to a fair trial was violated by the admission of prior evidence under the plan exception of K.S.A. 60-455. Because there was insufficient evidence presented in this case to show a "strikingly similar" or a "signature" act, we conclude that the trial court erred in admitting evidence of Dayhuff's prior crimes under the plan exception of K.S.A. 60-455. As a result, Dayhuff's case must be reversed and remanded for a new trial. Next, Dayhuff contends that his right to a fair trial was violated by the conduct of a child advocate during the child's testimony. We determine that the trial court's refusal to allow Dayhuff to develop a factual basis for his motion for mistrial at the time of trial denied him the opportunity to show what, if any, influence the child advocate's conduct may have had on the child's testimony when the child's credibility was being considered by the jury. Accordingly, we reverse and remand for a new trial.

Next, Dayhuff argues that cumulative error denied him a fair trial. Nevertheless, we have already determined that there is re-

versible error in this case. Whether considered alone or in combination, the errors in this case denied Dayhuff a fair trial.

Finally, citing *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), Dayhuff contends that the trial court erred in including his prior convictions in his criminal history. Because we are reversing, we need not consider Dayhuff's challenge to his criminal history. But see *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002).

*Facts*

On June 15, 2003, Pam Brown reported to the police that her daughter, H.D., had told Brown that she had been sexually abused by Dayhuff. Brown and Dayhuff had been married to each other but had divorced in February 1998. Brown told the interviewing officer that after returning home from a visit with Dayhuff, H.D. had told Brown that Dayhuff had put his hands down H.D.'s pants several times and had attempted to get H.D. to touch his penis. H.D. was 9 years old at the time of the alleged incidents.

The sexual abuse allegedly occurred when H.D. was staying with Dayhuff at his brother's home between June 2, 2003, and June 13, 2003. H.D. told Brown about the sexual abuse the day before she was scheduled to return to Dayhuff's home for another visit. Brown testified that H.D. told her that Dayhuff had touched her vagina and had attempted to place H.D.'s hand on his penis. H.D. told Brown that the touching had occurred at night. Brown called the police and reported the sexual abuse. Brown also faxed a voluntary written statement to the police department. After Brown faxed her statement, H.D. told Brown that Dayhuff had said that he would kill Brown if H.D. told her about the abuse.

Susan Beitzinger, an investigative social worker, interviewed H.D. on June 17, 2003. The interview was videotaped. Beitzinger was the only person with H.D. during the interview. A police officer and Katherine Adams, a child advocate, observed the interview through a one-way mirror. During the interview, H.D. told Beitzinger that she had lain down at night in a bedroom at Dayhuff's brother's home when Dayhuff raised her nightgown and reached into her underwear and touched her private part. H.D.

was lying in her bed, and Dayhuff was lying naked in his bed in the same room. Dayhuff's brother was in a downstairs bedroom. H.D. told Beitzinger that Dayhuff told H.D. to keep it a secret. The following morning, H.D. was still lying in her bed when Dayhuff asked her to touch his private part. H.D. refused to touch Dayhuff.

On June 24, 2003, Brown took H.D. to the hospital for a sexual assault examination. H.D. told the examining nurse, "I don't like my daddy any more. He touched me. He touched me a lot of times." The examining nurse found no physical evidence of sexual abuse. Nevertheless, the nurse testified that she would not expect to find any physical evidence of sexual abuse when a child had been touched on the outside of the vagina. Moreover, the nurse testified that when an exam occurs over 72 hours after the alleged sexual abuse, any trauma would have healed by that time.

The State charged Dayhuff with one count of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A). Before trial, the State moved to admit evidence of Dayhuff's prior crimes against his previous girlfriend's daughter, S.A., to show plan under K.S.A. 60-455. The trial court granted the State's motion to admit the evidence under K.S.A. 60-455. At trial, Bobbie Wiltsie, who investigated S.A.'s case, testified about four separate incidents of sexual abuse allegedly committed by Dayhuff against S.A. In addition, S.A. testified about two of these instances of sexual abuse. Before Wiltsie and S.A. testified, Dayhuff renewed his objection to the introduction of the prior crimes evidence under K.S.A. 60-455.

H.D. testified at trial about the alleged sexual abuse. H.D. recounted two incidents when Dayhuff had touched her while they were lying in separate beds in a bedroom at Dayhuff's brother's house. During the first incident, Dayhuff reached under H.D.'s clothes and touched the outside of her vagina. H.D. testified that Dayhuff was not naked when he touched her. H.D. testified that this incident occurred at night. In the second incident, Dayhuff again reached under her clothes and touched the outside of her private part. Dayhuff also grabbed H.D.'s hand and attempted to have her touch him. According to H.D., this second incident oc-

curred when it was dark outside. H.D. testified that Dayhuff told her to keep it a secret.

Immediately after H.D.'s testimony, Dayhuff moved for a mistrial on the basis that an individual in the courtroom had been gesturing to H.D. and shaking her head while H.D. testified, essentially coaching H.D.'s testimony. Dayhuff informed the trial court that another attorney, John Bullard, who was watching the trial, had told him of the individual's action and that defense counsel's secretary had also been in the courtroom. Dayhuff requested that he be allowed to present testimony from his counsel's secretary about the individual's actions. The trial court told Dayhuff that he could bring up the issue in a motion for a new trial if he was convicted.

The jury found Dayhuff guilty of aggravated indecent liberties with a child. Dayhuff moved for a new trial. Among numerous issues raised in his motion for a new trial, Dayhuff argued that although he informed the trial court that an individual in the courtroom had been directing H.D.'s testimony, the trial court did not take any action with this information. After conducting an evidentiary hearing, the trial court denied Dayhuff's motion for a new trial. The trial court sentenced Dayhuff to 204 months in prison.

## I. Was Dayhuff denied his right to a unanimous verdict?

First, Dayhuff argues that he was denied his right to a unanimous verdict because the State relied upon acts that were legally insufficient to sustain a conviction for aggravated indecent liberties with a child based upon how the crime was charged in the complaint.

K.S.A. 22-3403 and K.S.A. 22-3421 give a criminal defendant the right to a unanimous jury verdict. *State v. Unruh*, 281 Kan. 520, 527, 133 P.3d 35 (2006). An appellate court exercises de novo review over issues of jury unanimity. *State v. Kesselring*, 279 Kan. 671, 678, 112 P.3d 175 (2005).

Dayhuff maintains that the State argued to the jury that Dayhuff's conviction could be based upon either: (1) Dayhuff touching H.D. on the outside of her vagina; or (2) Dayhuff placing H.D.'s hand on his penis the next morning. The complaint in this case

charged Dayhuff with aggravated indecent liberties with a child based upon "engaging in an act of lewd fondling or touching of the person of H.D." Although K.S.A. 21-3504(a)(1)(A) defines aggravated indecent liberties with a child as engaging in "[a]ny lewd fondling or touching of the person of *either the child* [who is under 14 years of age] *or the offender*" (emphasis added), the State never amended the complaint to allege the alternative means of committing the crime by H.D. touching Dayhuff. Dayhuff alleges that the State's failure to amend or clarify the complaint to allege a lewd fondling or touching of Dayhuff resulted in jury confusion and violated his right to a unanimous verdict.

## A. *Instruction on Elements of Crime*

Nevertheless, the jury was properly instructed on the elements of aggravated indecent liberties with a child consistent with the elements alleged in the complaint. The jury was instructed that in order to convict Dayhuff of aggravated indecent liberties with a child, they needed to find that Dayhuff "fondled or touched H.D. in a lewd manner, with intent to arouse or to satisfy the sexual desires of either H.D. or the defendant, or both." No mention was made in the jury instruction of Dayhuff forcing or attempting to force H.D. to touch him. "As a general rule, juries are presumed to have followed instructions given by the trial court. [Citation omitted.]" *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003). Moreover, "[i]t is a jury's legal duty and proper function to accept the law as given in the instructions." *State v. McClanahan*, 212 Kan. 208, 214, 510 P.2d 153 (1973). The jury was properly instructed that the charged crime of aggravated indecent liberties with a child was based upon Dayhuff touching H.D.

## B. *State's Argument*

Moreover, Dayhuff mischaracterizes the State's argument to the jury. Before trial, Dayhuff sought to clarify the multiple acts upon which the State was proceeding. Dayhuff questioned whether the State was relying on the following acts: (1) the act where Dayhuff touched H.D. and (2) the act where Dayhuff forced H.D. to touch him the following morning. The State responded that the two acts

upon which it was proceeding were the two times that Dayhuff touched H.D., once at night and once in the morning.

Indeed, during opening statement, the State told the jury that the evidence would show there had been two instances of Dayhuff touching H.D., once at night and once in the morning. Moreover, at the beginning of closing argument, the State informed the jury that the evidence showed that there had been two instances of Dayhuff touching H.D.:

"Now that you've heard all the evidence, it should be apparent to you that Paul Dayhuff abused the trust with . . . [H.D.], when he touched her vagina, [not] once but twice. Both of these touches occurred between the days of June 2nd and June 13th, 2003, in Labette County in Oswego, Kansas."

The State proceeded to discuss the evidence that Dayhuff had touched H.D. twice, first at night and then the following morning. Although the State, while discussing the evidence concerning the second touching, did go over the testimony that Dayhuff had also attempted to force H.D. to touch him that morning, the State never argued that the act of H.D. touching Dayhuff could provide a basis for his conviction.

*C. Unanimity Instruction*

Although the State did not elect which of the two instances of Dayhuff touching H.D. it was relying to support the charged crime of aggravated indecent liberties with a child, there was no error here based on the unanimity instruction given to the jury. Where multiple acts are alleged and any one of them could constitute the crime charged, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in these cases, our Supreme Court has required that either the State elect the particular criminal act upon which it will rely for conviction or the trial court instruct the jury that all of the jurors must agree that the same underlying criminal act has been proved beyond a rea- sonable doubt. *State v. Dickson*, 275 Kan. 683, 696, 69 P.3d 549 (2003). The pattern jury instructions for Kansas have a specific instruction for use in multiple acts cases. See P.I.K. Crim. 3d 68.09- B. Here, the trial court instructed the jury in accordance with P.I.K. 68.09-B as follows: "The [S]tate claims distinct multiple acts

which each could separately constitute the crime of aggravated indecent liberties with a child. In order for the defendant to be found guilty of aggravated indecent liberties with a child, you must unanimously agree upon the same underlying act." Therefore, we conclude that Dayhuff was not denied his right to a unanimous verdict.

## II. Did the trial court err in admitting prior crimes evidence under K.S.A. 60-455?

Next, Dayhuff contends that the trial court violated his right to a fair trial by allowing the State to present evidence from a 1992 case, where he pled no contest to two counts of indecent liberties with a child, under the plan exception of K.S.A. 60-455.

Previously, our Supreme Court has stated that "[a]ppellate review of the admission of prior crimes evidence under K.S.A. 60-455 is limited to whether the trial court abused its discretion or whether the trial court admitted clearly irrelevant evidence. [Citations omitted.]" *State v. Dotson*, 256 Kan. 406, 412, 886 P.2d 356 (1994). More recently, however, our Supreme Court has applied a de novo standard in reviewing the trial court's admission of K.S.A. 60-455 evidence: "Reviewing whether the trial court properly admitted evidence pursuant to K.S.A. 60-455 requires the court to review the legal basis for the district court's decision. When an appellate court reviews the legal basis for admitting evidence, the standard of review is de novo." *State v. Horton*, 283 Kan. 44, Syl. ¶ 2, 151 P.3d 9 (2007).

In *State v. Overton*, 279 Kan. 547, 551-52, 112 P.3d 244 (2005), our Supreme Court set forth the requirements for the admissibility of evidence under K.S.A. 60-455:

"Although evidence of prior crimes and other civil wrongs is inadmissible to prove a person's propensity to commit crime, thereby implying that he or she committed the crime at issue, K.S.A. 60-455 allows the admission of such evidence when that evidence is relevant to prove some other material fact, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Before evidence of prior crimes may be admitted pursuant to K.S.A. 60-455, three requirements must be met. 'First, the evidence must be relevant to prove one of the facts specified in the statute. Second, the fact must be a disputed,

material fact. Third, the probative value of the evidence must outweigh its potential prejudice.' [Citation omitted.]"

If these three requirements are met, an appellate court's review is limited to whether the trial court abused its discretion. Discretion is abused when no reasonable person would take the view of the trial court. *State v. Jones,* 277 Kan. 413, 420, 85 P.3d 1226 (2004).

The State's motion to admit evidence under K.S.A. 60-455 requested that evidence of Dayhuff's prior sex crimes against S.A. be admitted to prove plan. After conducting an evidentiary hearing, the trial court allowed the State to introduce evidence of Dayhuff's prior criminal conduct towards S.A. under K.S.A. 60-455.

Wiltsie and S.A. testified at trial about Dayhuff's molestation of S.A. in 1991. Wiltsie was a child abuse investigator when he interviewed S.A. about the sexual abuse. S.A. told Wiltsie that in June 1991, S.A., her sister, her mom, and Dayhuff were all sleeping in a bedroom at Dayhuff's brother's home. Dayhuff was engaged to S.A.'s mother. In the middle of the night, S.A. had asked Dayhuff if she could sleep next to him because she was cold. S.A.'s mother and sister were in the same bed as Dayhuff. As S.A. was lying next to Dayhuff, he put his hand underneath her clothing and touched the outside of her vagina.

S.A. told Wiltsie about a second touching that occurred at S.A.'s house in Oswego. S.A., her sister, her mother, and Dayhuff were watching television when S.A. and her sister fell asleep on the floor of the living room. Dayhuff lay down on the floor and reached underneath S.A.'s clothing and touched the outside of her vagina. S.A.'s mother was asleep on the couch when the touching occurred. Wiltsie testified that S.A. told him about a third incident when S.A. and Dayhuff were again lying on the floor in the living room and he reached under her clothing and touched the outside of her vagina. S.A.'s mother was again asleep on the couch.

S.A. also told Wiltsie about a fourth touching that occurred in September or October 1991 when she was at home watching television. Dayhuff covered S.A.'s mother, who was asleep on the couch, with a blanket and lay down on the floor next to S.A. Dayhuff reached underneath S.A.'s clothing and touched the outside

of her vagina. Dayhuff placed S.A.'s hand on his penis, but S.A. pulled her hand away from him. Dayhuff again placed S.A.'s hand on his penis, but S.A. pulled her hand away from him and placed it under her pillow. S.A. was 10 years old when the incidents occurred.

S.A. testified at trial that she could remember only two of the touching incidents involving Dayhuff. S.A. testified about an incident when she and Dayhuff were lying on the floor watching television and her mother was asleep on the couch. S.A. had fallen asleep, and she awoke to discover Dayhuff touching the outside of her vagina. S.A. testified about a second incident that occurred when Dayhuff was lying next to her in the living room, and he reached underneath her clothing and touched the outside of her vagina. S.A. testified that Dayhuff placed her hand on his penis. S.A. pulled her hand away from Dayhuff, but he grabbed her hand again and placed it on his penis. S.A. pulled her hand away from Dayhuff again.

Before the jury retired for deliberations, the trial court instructed the jury that evidence admitted tending to prove that Dayhuff committed a crime other than the present crime charged "may be considered solely for the purpose of proving the defendant's plan."

In *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), our Supreme Court recognized two theories for admitting evidence of a prior crime or civil wrong to prove plan under K.S.A. 60-455. Under the first theory, evidence of a prior crime or civil wrong is admitted to show modus operandi or the general method the defendant used to commit similar but totally unrelated crimes. Recognizing that evidence of prior unrelated acts is admissible to show plan, our Supreme Court stated:

"The rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. [Citation omitted.]" 245 Kan. at 682.

Under the second theory, evidence of a prior crime or civil wrong is admitted to show plan where there is a direct or causal connection between the prior act and the crime charged.

The State acknowledges that this second theory does not apply to the present case. Instead, the State argues that evidence of Dayhuff's prior crimes was admissible under the first theory to show modus operandi or the method used by Dayhuff to commit the unrelated crimes. On the other hand, Dayhuff contends that his prior crimes were not sufficiently similar to the charged crime to demonstrate a modus operandi.

## A. Strikingly Similar

In *Jones*, 277 Kan. at 421, our Supreme Court recognized that several decisions have upheld the admission of K.S.A. 60-455 evidence in sex crime cases where the details of the plan for the prior crimes and the crime for which the defendant was on trial were "strikingly similar." *Jones* cited *State v. Rucker*, 267 Kan. 816, 826-29, 987 P.2d 1080 (1999); *State v. Tiffany*, 267 Kan. 495, 497-502, 986 P.2d 1064 (1999); *Damewood*, 245 Kan. at 682; and *State v. Aldaba*, 29 Kan. App. 2d 184, 189-92, 25 P.3d 149 (2002), as examples of such decisions. Moreover, in *State v. Tolson*, 274 Kan. 558, 564, 56 P.3d 279 (2002), our Supreme Court held that the method of operation in *Damewood* was so distinct as to be a "signature." Nevertheless, our Supreme Court in *Jones* pointed out that in *State v. Clements*, 252 Kan. 86, 90, 843 P.2d 679 (1992), it upheld the admission of prior crimes evidence to prove plan under K.S.A. 60-455 with no requirement of "striking" similarities because the evidence showed that the general method used by the defendant was " 'similar enough to show a common approach that is tantamount to a plan.' " *Jones*, 277 Kan. at 421.

Our Supreme Court in *Jones* analyzed the admissibility of prior crimes evidence to show plan under K.S.A. 60-455 by comparing the similarities to the dissimilarities between the prior crimes and the crime for which the defendant was on trial. In making this comparison, our Supreme Court discounted the similarities that may exist in many child sexual abuse scenarios. See 277 Kan. at 421-23.

In the instant case, as in *Jones*, both similarities and dissimilarities existed between the prior crimes and the crime charged. Both S.A. and H.D. were young girls—S.A. was 10 and H.D. was 9 when

the abuse occurred. Dayhuff touched both S.A. and H.D. by reaching under their clothing and touching the outside of their vaginas. During one of the incidents with S.A., Dayhuff forced S.A. to touch his penis. Similarly, during one of the incidents with H.D., Dayhuff either forced or attempted to force H.D. to touch his penis. One of the incidents with S.A. and both of the incidents with H.D. occurred in a bedroom at Dayhuff's brother's home where they were staying overnight. Dayhuff and both S.A. and H.D. were lying down during the incidents.

The dissimilarities in this case were that all of the incidents with S.A. occurred when there was another adult sleeping in the room. In contrast, Dayhuff was alone with H.D. when the alleged incidents occurred. Three of the incidents with S.A. occurred in the living room of S.A.'s home, while both incidents with H.D. occurred in a bedroom of Dayhuff's brother's home. Further, Dayhuff told H.D. to keep the abuse a secret or told H.D. that he would kill Brown if H.D. told anyone. On the other hand, there was no evidence that Dayhuff made a similar request of S.A. or threatened S.A. Moreover, H.D. was related to Dayhuff, while S.A. was the daughter of Dayhuff's fiancée.

In arguing before the trial court that Dayhuff's conduct was a "signature act," the State cited *State v. Kackley*, 32 Kan. App. 2d 927, 92 P.3d 1128, *rev. denied* 278 Kan. 849 (2004). In *Kackley*, this court found that the defendant's act of first placing the hands of his underage girl victims on his exposed penis was a "signature" act. This court stated that "it is a signature act because it is so strikingly similar in pattern or modus operandi as to authenticate the conduct as the defendant's when it is allegedly replicated in a later case." 32 Kan. App. 2d at 932. This court distinguished *Jones* because there was no such signature sexual act in that case. In *Jones*, our Supreme Court noted that the prior crime involved only fondling in isolation, while the crime charged began with intercourse in a group. In *Kackley*, this court further distinguished *Jones* because the dissimilarities in *Kackley* between the prior acts and the crime charged were either relatively minor or reflected only the degree of success obtained. This court upheld the admission

of the K.S.A. 60-455 evidence to show plan. 32 Kan. App. 2d at 932.

In *Kackley*, the defendant's "signature act" seems to be conduct that might occur in many sexual abuse scenarios. Similarly, the conduct in this case might be present in many sexual abuse scenarios. Nevertheless, the dissimilarities in this case are greater than those in *Kackley*. Dayhuff perpetrated all of the acts against S.A. when there was another adult in the room. On the other hand, no other people were present in the room when he committed the acts against H.D. Dayhuff told H.D. to keep the acts a secret or threatened H.D., while there is no evidence that he made similar statements to S.A. Further, Dayhuff points out that the act of placing or attempting to place the underage girls' hands on his penis allegedly occurred in only one of the four prior incidents and in only one of the two incidents involving H.D. In *Kackley*, this type of conduct occurred in both incidents.

Moreover, this case is different from *Kackley*, where the court found, as another reason for upholding the decision of the trial court, that the admission of the prior crimes evidence to show plan under K.S.A. 60-455 constituted harmless error. See 32 Kan. App. 2d at 932-33. Such a result cannot be reached in the instant case. As discussed later in this decision, the admission of the prior crimes evidence was not harmless under the facts of this case.

Dayhuff cites *State v. Davidson*, 31 Kan. App. 2d 372, Syl. ¶ 7, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003), where this court determined that the trial court's admission of evidence under K.S.A. 60-455 to show plan was error. There, this court noted the following similarities between the defendant's prior conduct and the crime charged: (1) all of the victims were related to the defendant by marriage and were under the age of 10; (2) some form of fondling to ejaculation was among the sex acts; (3) the abuse occurred in the absence of other adults; and (4) all of the victims were threatened. This court discounted the similarities, such as isolation of and threats toward the victim, that are present in nearly all child sexual abuse scenarios. The dissimilarities were that most of the charged acts did not match the prior conduct with the female victims and that the victims were different genders. This court

concluded that "this case lacks the 'striking' similarities that have marked our precedents" and determined that the prior bad acts evidence should not have been admitted to show plan under K.S.A. 60-455. 31 Kan. App. 2d at 384.

Here, as in *Davidson*, this case lacks the "striking" similarities present in previous cases. The similarities in this case, when compared with the dissimilarities, do not seem to rise to the level of "strikingly similar" as in those cases cited in *Jones*; see *Rucker*, 267 Kan. at 826-29 (both victims were 5-year-old stepchildren abused until puberty, defendant applied lubricant and rubbed victims' vaginal areas with his penis until ejaculation, defendant slapped victims if they protested, and defendant threatened to kill victims' pets); *Tiffany*, 267 Kan. at 497-502 (defendant used similar words to entice victims into performing requested acts, victims were all about the same age, and criminal conduct was performed in same manner); *Damewood*, 245 Kan. at 679-82 (defendant arranged time alone with young teenage boys by soliciting their involvement in beekeeping operation and then sexually molesting them); *Aldaba*, 29 Kan. App. 2d at 189-92 (both victims were young boys when molested, defendant forced penis into victim's mouth in both incidents, both incidents allegedly occurred when defendant stayed overnight in same residence with victim, and each victim threatened with bodily harm if abuse revealed). In each of those cases, there was a unique mode of operation or a "signature act" by the defendant that was so strikingly similar that the conduct could be recognized as the work of the defendant when it happened again in a later case. Here, there was no "signature act" or distinct mode of operation used by Dayhuff. Although all of the incidents were similar in that Dayhuff reached under the clothing of both underage girls and touched the outside of their vaginas, this conduct may be present in many sexual abuse scenarios. This conduct is not so "strikingly similar" as to be called a distinct mode of operation used in committing the crimes.

Citing *Clements*, 252 Kan. at 90, the State asserts that the trial court needed to determine only that the offenses were "similar enough" in order to admit the evidence under K.S.A. 60-455 to show plan. Our Supreme Court has never clarified whether the

standard is "signature act," "strikingly similar," or "similar enough" when determining whether the prior crimes evidence is relevant to show plan under K.S.A. 60-455. See *Jones*, 277 Kan. at 423. Nevertheless, since *Clements* our Supreme Court and this court have more recently applied the "strikingly similar" or the "signature act" standard when determining whether prior crimes evidence is relevant to show plan; see *Rucker*, 267 Kan. at 826-28; *Tiffany*, 267 Kan. at 500; *Kackley*, 32 Kan. App. 2d at 932; *Davidson*, 31 Kan. App. 2d at 381; and *Aldaba*, 29 Kan. App. 2d at 190. Our Supreme Court has never defined the term "similar enough," and *Clements* provides little guidance on the analysis for such a standard. Based on how our Supreme Court and this court have been treating the issue, a "strikingly similar" or a "signature act" analysis is the appropriate standard for this case.

Because there was insufficient evidence presented in this case to show a distinct mode of operation that was "strikingly similar" or a "signature act," we conclude that the trial court erred in admitting evidence of Dayhuff's prior crimes under the plan exception of K.S.A. 60-455.

## B. *Harmless Error*

Our next step is to determine whether the admission of the prior crimes evidence to show plan under K.S.A. 60-455 constituted harmless error. Citing *State v. Henry*, 273 Kan. 608, Syl. ¶ 7, 44 P.3d 466 (2002), our Supreme Court in *State v. Jones*, 277 Kan. 413, 423, 85 P.3d 1226 (2004), set forth the harmless error rule as follows:

" 'Normally, the admission or exclusion of evidence is measured by the harmless error rule. In determining if the erroneous admission or exclusion of evidence is harmless, the appellate court must consider if it is inconsistent with substantial justice, *i.e.*, affects the substantial rights of a defendant and, if not, whether this court can declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.' "

In this case, the only evidence of the sexual abuse came from H.D.'s statements and testimony. Dayhuff testified at trial and denied the alleged acts. Thus, H.D.'s credibility was vitally important in securing a conviction against Dayhuff. The evidence of Dayhuff's

prior crimes was a significant part of the State's case. Several pages of closing argument were spent discussing the prior crimes and comparing those acts with the acts in the present case. Because the prior crimes evidence failed to meet the plan exception under K.S.A. 60-455, the admission of such evidence may have unfairly created the inference that Dayhuff had the propensity to commit the charged crimes. See *Jones*, 277 Kan. at 424. Based on the facts of this case, the prior crimes evidence was unduly prejudicial. Further, we are unable to conclude that the erroneous admission of such evidence had little, if any, likelihood of having changed the result of the trial. See 277 Kan. at 424. As a result, we reverse and remand for a new trial.

### III. Did the child advocate's conduct violate Dayhuff's right to a fair trial?

Next, Dayhuff argues that his right to a fair trial was violated because the child advocate's gestures during H.D.'s testimony served to coach H.D. and vouch for H.D. in the eyes of the jury. Based on these actions, Dayhuff maintains that the trial court should have granted his motion for a mistrial during the trial or his motion for a new trial at sentencing.

Citing *In re Habeas Corpus Application of Pierpont*, 271 Kan. 620, 24 P.3d 128 (2001), and *State v. Anderson*, 259 Kan. 16, 18, 910 P.2d 180 (1996), Dayhuff asserts that the question of whether he was denied his right to a fair trial under the Due Process Clauses of the United States and Kansas Constitutions presents a question of law over which this court has unlimited review. Nevertheless, neither *Anderson* nor *Pierpont* involved the issue that is present here. *Anderson* concerned the trial court's denial of the defendant's motion to suppress evidence. *Pierpont* concerned the amount of process due an inmate in a prison disciplinary proceeding. The standards cited in *Anderson* and *Pierpont* do not apply here.

Rather, the appropriate standard of review appears to be whether the trial court abused its discretion in failing to declare a mistrial or to grant a new trial. Recognizing that the declaration of a mistrial is within the trial court's discretion, our Supreme Court

in *State v. Dixon*, 279 Kan. 563, 592-93, 112 P.3d 883 (2005), stated:

"The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the decision will not be set aside on appeal unless an abuse of discretion is clearly shown. The defendant has the burden of proving that he or she was substantially prejudiced. [Citation omitted.]"

Similarly, when reviewing the trial court's decision of whether to grant a new trial, an appellate court is limited to determining whether the trial court abused its discretion. *State v. Kirby*, 272 Kan. 1170, 1192, 39 P.3d 1 (2002).

With these standards firmly in mind, we turn now to the facts of the instant case. Immediately after H.D.'s testimony at trial, defense counsel moved for a mistrial on the basis that an individual in the courtroom had been nodding her head and making gestures to H.D. while she testified, essentially coaching H.D.'s testimony. Defense counsel informed the trial court that his secretary and another attorney in the courtroom, John Bullard, had witnessed the individual's actions.

The trial judge informed Dayhuff that there was no factual basis at that time for a decision to be made on his motion for mistrial:

"Now you can make a record if you want to. We can go through all this on a motion for new trial, you can do anything you want but I'm saying right now at this time, there's no factual basis for me to make a decision like that."

Defense counsel proceeded to request a hearing where his secretary could testify about the individual's actions in the courtroom. The prosecutor informed the trial court that he would also need to call as witnesses people who had been in the courtroom. Declining to address the motion for mistrial, the trial court stated:

"We can take it all up on a, we'll see how this thing plays out and it can all be sorted out in motions for new trial if there's a conviction, if there's a conviction. We don't have the time to deal with this right now."

By declining to address Dayhuff's motion for a mistrial, the trial court denied Dayhuff an opportunity to develop a factual basis as to whether he was prejudiced by the individual's actions in the

courtroom. Our Supreme Court in *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986), stated that "the trial judge is charged with the preservation of order in his court and with the duty to see that justice is not obstructed by any person or persons whatsoever." Moreover, recognizing that a trial judge has the responsibility to see that the full truth is developed by the evidence, our Supreme Court in *State v. Norwood*, 217 Kan. 150, 152, 535 P.2d 996 (1975), stated:

"A defendant in a criminal trial is entitled to a fair and impartial trial. . . . The purpose of a trial in a criminal case is to ascertain the truth or falsehood of the charges against the defendant, and it is a part of a duty of the trial judge to see that the full truth is developed by the evidence. [Citation omitted.]"

Once Dayhuff brought it to the trial court's attention that an individual had been gesturing to H.D. and possibly coaching her testimony, the trial court had the responsibility to initiate an investigation to ensure that H.D.'s testimony had not been influenced by the individual's actions and that the jury had not been affected by the conduct.

To illustrate, in *Sharp v. Commonwealth*, 849 S.W.2d 542 (Ky. 1993), the trial court conducted a hearing in chambers after the defendant moved for a mistrial on the basis that a courtroom bystander had been gesturing and signaling to a child witness during the child's testimony. During the hearing, the bystander, a friend of the child's family, admitted that she had been gesturing to the child witness to comfort and encourage the child during her testimony. In addition, the bystander admitted that she had told at least one sequestered witness about certain portions of the child's testimony and had entered the room where these sequestered witnesses were waiting. At the hearing on the defendant's motion for mistrial, the trial court questioned the bystander and potential witnesses who were sequestered in the witness room. Moreover, the trial court heard from the person who observed the bystander's actions and also the child witness. The trial court then denied the defendant's motion for a mistrial. Although the appellate court reversed the trial court's decision, that portion of the opinion will be discussed in greater detail later.

Here, no similar attempt was made by the trial court to determine to what extent the individual's conduct had affected H.D.'s testimony and the jury. Dayhuff was not even allowed to present evidence concerning the individual's identity or the kinds of gestures she was making to the child witness.

Although Dayhuff again raised this issue in his motion for a new trial, the evidentiary hearing on his motion was held nearly 7 months after his trial. By this time, it was discovered that Katherine Adams, a child advocate who had worked with H.D. during the case, was the individual seen by Bullard and defense counsel's secretary in the courtroom. Adams had also observed H.D.'s interview with Susan Beitzinger, where H.D. disclosed that Dayhuff had sexually abused her.

At the evidentiary hearing on Dayhuff's motion for a new trial, defense counsel's secretary testified that she saw a woman sitting in the back of the courtroom gesturing to H.D. during H.D.'s testimony. She testified that she saw the woman giving a thumbs up to H.D., smiling at H.D., nodding and shaking her head, and changing her position to maintain eye contact with H.D. Bullard testified that he saw the woman smiling, nodding her head, and changing her position to maintain eye contact. Nevertheless, he never saw the woman gesturing with her hands.

Adams testified that during H.D.'s testimony, she smiled at H.D. and moved around the courtroom so that she would remain in H.D.'s sight. Adams indicated that she might have nodded to H.D. but denied gesturing to H.D. with her hands. Adams denied coaching H.D. or directing her testimony. Adams testified that she was present during H.D.'s testimony for support and encouragement. Adams stated that her job as a child advocate was to make sure the child was comfortable and to give the child a focal point so that the child could get through the testimony.

At the end of the evidentiary hearing, the trial court ruled on numerous issues in Dayhuff's motion for a new trial. Nevertheless, the trial court never ruled on the present issue. Therefore, the trial court never exercised its discretion as to whether Adams' conduct prejudiced Dayhuff. Moreover, there are no factual findings in the record that would resolve the conflicting testimony as to whether

Adams actually gestured with her hands to H.D. At a minimum, we know that Adams moved around the courtroom to maintain eye contact with H.D. and that she smiled and nodded her head to support and to encourage H.D.

The State attempts to compare this case to *State v. Rowray*, 18 Kan. App. 2d 772, 776-78, 860 P.2d 40, *rev. denied* 254 Kan. 1009 (1993), where this court held that the defendant's right to a fair trial was not violated, nor did the trial court abuse its discretion when it allowed the mother of two child witnesses to sit behind them as they testified before the jury. *Rowray*, however, is distinguishable from the present case because the mother did not actively support and encourage the child witnesses during their testimony. In fact, *Rowray* seems to indicate that any prompting or gesturing to the witness could be problematic. After citing numerous cases from other jurisdictions, this court stated:

"Although the wording of each opinion [cited from other jurisdictions] differs slightly, the common thread running through the holdings is that when the accompanying party does not speak, prompt the witness, or in any manner attempt to disrupt or influence the trial, the trial judge's discretion is not abused in permitting an adult support person to be in close proximity to a minor while the minor testifies." 18 Kan. App. 2d at 776.

Because Adam's actions involved more than sitting passively in close proximity to H.D., the holding in *Rowray* does not apply here.

The conduct in this case is more similar to that in *Sharp*, 849 S.W.2d at 546-47, where the courtroom bystander admitted that she had mouthed " 'You're doing fine' " to the child witness and that she gave approving gestures by winks and a thumbs-up sign. In *Sharp*, however, the trial court heard from the person who observed the bystander's conduct. That person was convinced that the gestures told the child whether to answer yes or no to the questions and whether she approved of the child's answers. In reversing the trial court's denial of the defendant's motion for a mistrial, the Kentucky Supreme Court stated:

"The child victim on the witness stand was a crucial witness for the Commonwealth. Her demeanor during testimony and her ability to withstand cross-examination inevitably influenced the jury as to whether or to what extent she should

be believed. Even taking Ms. Hess's version of what she did at face value, the witness received encouragement, approval and comfort at the time her credibility was being assessed by the jury. It would be impossible to say that the witness did not derive confidence and assurance from this positive reinforcement which influenced the jury to believe her." 849 S.W.2d at 547.

Concerning the bystander's contact with the sequestered witnesses, the court stated that whether such conduct affected the trial can never be known because defense counsel never recalled the witnesses to the stand after learning that they had been told about portions of the child's testimony. 849 S.W.2d at 547. The Court concluded by noting that a trial court has broad discretion to determine whether a violation of proper courtroom conduct requires a mistrial. Nevertheless, the violations in that case were "so egregious and inimical to the concept of a fair trial that they cannot be disregarded in the name of trial court discretion." 849 S.W.2d at 547.

Here, the record fails to show why the trial court did not take up Dayhuff's motion for mistrial and hold a hearing on whether the alleged improper acts influenced the jury. It is undisputed that Adams moved around the courtroom, nodded, and smiled to H.D. during her testimony. Although the conduct falls short of the behavior in *Sharp*, Adams was actively supporting and encouraging H.D. at the time her credibility was being assessed by the jury. As in *Sharp*, "[i]t would be impossible to say that the witness did not derive confidence and assurance from this positive reinforcement which influenced the jury to believe her." 849 S.W.2d at 547. Moreover, "[t]he trial court has an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment [to the United States Constitution]. *Wheat v. United States*, 486 U.S. 153, 161, 100 L. Ed. 2d 140, 108 S. Ct. 1692 (1988)." *State v. Jenkins*, 257 Kan. 1074, 1084, 898 P.2d 1121 (1995).

The main problem in this case is that the trial court never allowed Dayhuff to develop a factual basis for his motion for mistrial at the time of trial. Our Supreme Court in *A. & N. Rld. Co. v. Wagner*, 19 Kan. 335, Syl. ¶ 4 (1877), recognized that when a party to a lawsuit believes that a witness has been compelled to testify

falsely against him, he may immediately call the court's attention to the matter so that it can be investigated:

> "Where, after all the testimony has been heard, but before the arguments have commenced, one of the parties ascertains or has good reason to believe that one of his adversary's witnesses has been compelled by such adversary to testify falsely against him, he is not obliged to wait until after the verdict, and then seek a remedy for the wrong by a motion for a new trial, but may immediately call the attention of the court to the matter and have it investigated, and if true, the fact made known to the jury before retiring to consider of their verdict."

Here, Adams was intimately involved with the case and had heard H.D.'s statements about the alleged abuse. Moreover, Adams admitted that she encouraged and comforted H.D. by smiling, nodding, and moving around the courtroom so that she would remain in H.D.'s sight. Adams stated that she did these things to give the child a focal point so that the child could get through the testimony. If the trial court had allowed Dayhuff to proceed with his motion for mistrial, it could have determined to what extent, if any, Adams' conduct had influenced H.D.'s testimony. The trial court could have asked H.D. about Adams' actions. Moreover, the parties would have had the opportunity to present testimony from other courtroom bystanders who had seen Adams' conduct.

Nevertheless, the trial court refused to allow Dayhuff to proceed any further with his motion for mistrial even after Dayhuff requested to put his counsel's secretary on the stand to develop the facts of what had occurred in the courtroom. The trial court's actions were similar to a denial of a party's request to make a proffer. A refusal by the trial court to permit the making of a proffer is usually error. See *State v. Hodges*, 241 Kan. 183, 191, 734 P.2d 1161 (1987). By forcing Dayhuff to take up this issue in a motion for a new trial that was heard nearly 7 months after the trial, the trial court denied Dayhuff the opportunity to show how he may have been prejudiced by Adams' actions. Conducting a hearing nearly 7 months after trial is simply inadequate to investigate the matter as to how the child advocate's conduct may have impacted the child's testimony and affected the jury. Therefore, Dayhuff must be granted a new trial.

*IV. Was there cumulative error?*

Next, Dayhuff contends that cumulative trial error substantially prejudiced him and denied him a fair trial. "Multiple trial errors may require reversal of a defendant's conviction if the cumulative effect of the errors substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found if the evidence against the defendant was overwhelming." *State v. Schoonover*, 281 Kan. 453, Syl. ¶ 34, 133 P.3d 48 (2006).

In the present case, the trial court erred in admitting evidence of Dayhuff's prior convictions under the plan exception of K.S.A. 60-455. In addition, the trial court erred in failing to allow Dayhuff to develop a factual basis to show how he was prejudiced by Adams' conduct. Whether considered alone or in combination, the effect of these errors substantially prejudiced Dayhuff and denied him a fair trial. Because the evidence was not overwhelming in this case, these errors warrant reversal.

Reversed and remanded.