No. 95,729

State of Kansas, *Appellee*, v. Kim E. Crum, *Appellant*.

(184 P.3d 222)

Opinion filed May 16, 2008.

*Jessica R. Kunen*, of Lawrence, argued the cause and was on the brief for the appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Paul J. Morrison*, attorney general, were with her on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Kim E. Crum appeals from his jury trial conviction for the first-degree premeditated murder of John Neal. Crum makes multiple claims of prosecutorial misconduct; complains about two exhibits; argues that he should not have been required to proceed with an appointed attorney with whom he had a conflict; contends that violations of an in limine order should mandate reversal; and asserts that cumulative error denied him a fair trial. Although Crum did not receive a perfect trial, we find that reversal of his convictions is not required.

In the early morning of January 1, 2005, Neal died of multiple blunt force and sharp force injuries. A number of people testified as to their respective recollection of the events surrounding the homicide. There were some inconsistencies in the various descriptions of the witnesses, especially as to the time of day that certain events occurred. However, Crum does not challenge the sufficiency of the evidence, so a full recitation of each witness' testimony is unnecessary.

Tamara Fainter lived in a triplex with her teenaged son, Colby Carson, and a daughter. Her boyfriend, Crum, was a frequent overnight guest. For a few weeks prior to the murder, Fainter had occasionally permitted Neal, who was homeless, to sleep on her couch. Often, Neal would arrive at Fainter's residence in an intoxicated condition which made him loud and talkative. If the other inhabitants were trying to sleep, they would admonish Neal to be quiet. Sometimes, Neal would take offense to the admonishments and leave the house for another friend's house or to pass out in the yard or in Fainter's car.

Fainter and Crum attended a New Year's Eve party, returning home early in the morning of the murder. Fainter testified that she was drunk and passed out. Carson arrived home later from another party. Subsequently, Neal appeared and began "preaching" to Carson, who responded by yelling at Neal to be quiet. The

ruckus awakened Fainter, albeit she remained in bed. Neal eventually left the house.

According to Fainter and Carson, Crum got dressed and went outside shortly after Neal's departure. Later, the two heard yells or screams and went outside to investigate. Some time later, they observed Crum, ostensibly in possession of a piece of wood or handle. Carson said Crum went inside Fainter's house, then exited to walk toward an abandoned house next door.

Fainter then took Carson to the home of a friend, Jaimie Brown, but Carson soon returned home. Brown and her mother, Tami Spann, eventually came to the Fainter residence, and Spann purportedly discovered Neal's body in back of the adjacent abandoned building. Spann then returned inside the Fainter residence and confronted Crum, accusing him of the murder.

The police were called, but when they arrived, Crum hid in the attic for a time. A wooden-handled hammer was located under a tree some distance from the site of the murder. DNA from the hammer matched Neal's DNA. Also, Neal's DNA was contained in blood and matter found on Crum's shoe. Crum told the police that he went to bed after the party and slept through the entire ruckus, and that his shoe was contaminated when he later went out to observe Neal's body. At the police station, Crum asked an officer how long the sentence was on a murder case.

Ultimately, a jury convicted Crum of the first-degree premeditated murder of Neal, and Crum received a hard 50 life sentence.

## PROSECUTORIAL MISCONDUCT

In his first two issues, Crum raises questions of prosecutorial misconduct, which triggers a two-step analysis: First, did the prosecutor exceed the bounds of permissible conduct. Second, if so, did the conduct constitute plain error; that is, did the statements or conduct prejudice the jury against the defendant and deny the defendant a fair trial. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

"The second step requires three factors to be considered: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and over-

whelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met. [Citation omitted.]" *Albright*, 283 Kan. at 428.

### Attack on Defense Counsel

Crum's first challenge is to the prosecutor's rebuttal comments relating to defense counsel's closing argument. Defense counsel suggested to the jury that the truth never changes, but that false stories will change with each telling because it is difficult to remember what one has said previously. Defense counsel then reviewed the inconsistencies in the testimony of Fainter, Carson, Brown, and Spann, and argued the incredible nature of some of the testimony, such as Spann confronting Crum about killing Neal, rather than calling the police. The defense concluded:

"There are inconsistencies that are huge. Now, you see the pictures of the body and you see the size of my client and you see the size of Colby [Carson]. Who could have beaten him to death and dragged the body around the back? That's what you have to decide."

The prosecutor began the rebuttal closing argument by stating:

"You know, defense counsel can sit here and he can ridicule these people as much as he wants, he can use his little voices and say they said this, they said that, he can talk about them taking six steps and he can talk about them taking 10 steps. What he wants to do is he wants to belittle these people, he wants you to decide if I put myself in their shoes, which ladies and gentlemen, I'm not asking you to do, are they doing things that are stupid, are they being ridiculous. He's berating them. Nobody would be stupid enough to go back to where a killer is and yell at him, nobody would be stupid enough to try to keep the person they love from going to prison.

"Well, ladies and gentlemen, Tami Spann was on that stand and do you believe for a second that she wasn't actually gonna go in there and confront him? You saw her, she was gonna do it. And what's more, is that when he got on the stand he sat there and he said she did come in and yell at me. So is it that stupid for us to believe that they would act like that, when he said she did it? Is it necessary to belittle them and berate them for the ways their memories have changed?"

Crum argues that the prosecutor was attacking the defense counsel instead of addressing the inconsistencies in the witnesses'

statements, which were the core of the defense. He asserts that the prosecutor's comments improperly shifted the jury's focus to a personal analysis of the defense counsel instead of an objective analysis of the evidence. In support, Crum cites to Florida cases where reversal was based on prosecutorial misconduct in closing argument, including attacks on the defense counsel. See, *e.g.*, *Adams v. State*, 830 So. 2d 911, 915-16 (Fla. Dist. App. 2002); *Lewis v. State*, 780 So. 2d 125, 131 (Fla. Dist. App. 2001); *Barnes v. State*, 743 So. 2d 1105, 1108 (Fla. Dist. App. 1999). We find that the peculiar facts of those cases render them unpersuasive here.

Obviously, "[t]rials cannot be allowed to degenerate into name-calling contests." *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997) (prosecutor called both defendant and defense counsel liars). However, fair comment on trial tactics and the interpretation of evidence is allowed, so long as care is taken not to "inappropriately denigrate opposing counsel or inject personal evaluations of the honesty of witnesses." *State v. Mosley*, 25 Kan. App. 2d 519, 525, 965 P.2d 848, *rev. denied* 266 Kan. 1113 (1998). We perceive that the prosecutor's statements were fair comment on the defense tactic of suggesting to the jury that the inconsistencies in the testimony of the State's witnesses proved the testimony to be false. If the defense attempts to put the State's witnesses on trial, the prosecutor can point that out to the jury.

Further, in addressing the defense argument that Spann's story was illogical and incredible, the prosecutor was certainly within the bounds of fair argument to remind the jury that defendant's own testimony corroborated parts of Spann's testimony. Thus, we find that the prosecutor's comments were not outside the wide latitude permitted in discussing the evidence and did not constitute prosecutorial misconduct.

### Cross-examination of Defendant

Next, Crum argues that the State improperly cross-examined him on the credibility of the State's witnesses and on the existence of premeditation. With respect to witness credibility, Crum points to the following exchange:

"Q. You heard Colby [Carson] testify, saying that he himself came home at three or 4:00 a.m.; is that right?

"A. That's correct.

"Q. Then you also heard that when he talked to officers he might have said two or 3:00 a.m., right?

"A. Yes, I heard that.

"Q. That's not really a big deal, is it?

"A. To me, it's not. Colby was never there as far as I know.

"Q. I mean, mixing up three or 4:00 a.m. or two or 3:00 a.m., really no big deal, right?

"A. That's correct.

"Q. Doesn't really affect this case at all, does it?

"A. It doesn't affect me. I told ya I was asleep, I don't know what time Colby came home.

"Q. But you yourself could, you know, easily say three or 4:00 a.m. to somebody and say two or 3:00 a.m. another time and it wouldn't be that important, would it?

"A. Yeah, it would be important. I'm the one on trial here, not Colby.

"Q. So it's important to you now in this case?

"A. That's correct."

Crum suggests that the questioning was designed to elicit his opinion that Colby Carson's inconsistent testimony about the time of day did not affect the credibility of Carson's other testimony. Crum admits there was no contemporaneous objection to the questions but points out that we have considered questions of prosecutorial misconduct even in the absence of an objection. See *Albright*, 283 Kan. at 428.

The State counters that the prosecutor was simply pointing out the trivial nature of the inconsistencies in time of day testimony, and that it was proper to do so on cross-examination. However, the State does not explain the relevance of the defendant's opinion as to the triviality of the State's witness' inconsistent testimony. We perceive no purpose for the question, other than to bolster the credibility of that State's witness, *i.e.*, to facilitate an argument that the State's witness is not lying notwithstanding the inconsistencies. We have plainly said that "[q]uestions which compel a defendant or witness to comment on the credibility of another witness are improper" because weighing the credibility of witnesses "is the province of the jury." *State v. Manning*, 270 Kan. 674, 698, 19 P.3d

84 (2001). Moreover, an even more basic rationale for prohibiting a question which invites the witness to comment on the truthfulness of another witness is that such a question is argumentative and seeks information beyond the witness' competence. 270 Kan. at 698.

Accordingly, we find that the prosecutor's questions about the weight that the defendant would give to Carson's inconsistent testimony was improper. Nevertheless, in *Manning*, the court found that the impropriety of the prosecutor's questions was tempered by the defendant's responses. 270 Kan. at 701. The same is true here. Crum's responses ameliorated, if not negated, the prosecutor's intended result, and we can declare beyond a reasonable doubt that the questioning did not change the result of the trial.

The other line of questioning challenged by Crum was the prosecutor's attempt to elicit Crum's opinion that the crime scene demonstrated that the killing was premeditated. During cross-examination, the prosecutor asked Crum: "Somebody meant to hit him with a hammer that many times, right?" Crum responded: "I don't know what somebody meant to do." The prosecutor then asked if someone hits a person with a hammer that many times, they mean to kill him, to which Crum responded: "Apparently. That's what they accomplished. That's what it looks like." Although Crum had declared that he took the witness stand because he was innocent, the prosecutor tried unsuccessfully to get Crum to admit that he killed Neal.

Later in Crum's cross-examination, the following exchange occurred:

"Q. To beat someone on the side of the building and then drag them around back and continue to beat them, that means somebody really thought about it, doesn't it?

. . . .

"A. If that's what took place, if he was beat on both places, yeah, and then drug somewhere, yeah, it had to been put some thought into it.

"Q. They put thought into it and they wanted to—they wanted him to die?

"A. I can't answer what they wanted him to do. I can tell you what I didn't do so—"

Crum argues that the cross-examination, in addition to invading the province of the jury, was inflammatory, called for speculation

and opinion evidence, and was prejudicial. The State cites to K.S.A. 60-456(a), which sets forth the provisions on admissibility of opinion testimony from lay witnesses.

"If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony." K.S.A. 60-456(a).

Crum had personally viewed Neal's body behind the abandoned building, so arguably his opinion on what the crime scene disclosed about the killer's thoughts and legal intent were based on his personal perceptions. Where the State's reliance on K.S.A. 60-456(a) falters is that Crum's opinion on premeditation had no bearing on the jury's ability to understand Crum's testimony and had no relevance to the jury question of premeditation. What Crum might think was in the killer's head was no more material to the case than what any given person on the street might opine. Again, the solicitation of Crum's opinion on premeditation was argumentative, sought information beyond the witness' competence, and invaded the province of the jury.

Again, however, the prejudicial effect of the questioning was tempered by Crum's responses. Thus, the questioning alone would not require our reversal.

### Closing Argument on Premeditation

What is of greater concern is how the prosecutor used the improperly elicited opinion testimony on premeditation in its closing argument to suggest that the State had been absolved of its duty to prove the critical element of premeditation. Specifically, the prosecutor argued:

"You don't even get to second-degree murder, ladies and gentlemen, if you've determined that first-degree murder was proven with no reasonable doubt. If you have determined that Kim Crum committed first-degree murder with no reasonable doubt, you don't even move to the second-degree murder charge. And I'm not going to discuss second-degree murder in detail, because look at it, it's first-degree murder and you just take out one number, okay, you take out the premeditation part.

. . . .

"Now, I can stand up and argue till I'm blue in the face, striking somebody once may be an accident, twice may be an accident, three times you meant it, four times you meant it, five times you meant it, six times you meant it, up until we get to 16 times, same thing with the six blows to the face and the other multiple times to the body.

"But I don't really need to argue that to you, ladies and gentlemen, because Kim Crum took the stand and on the stand he said well, if somebody does that to somebody, they meant to kill 'em. All right? That's the defendant, that's what he said. Kim Crum says somebody intended to kill John Neal. Wipe that element out.

"What next does the State have to prove? Premeditation. You have the definition. I can argue about how getting two different weapons means that you had to think about killing him. How about thinking about going and finding John Neal means that you had a plan to go kill him? How about beating him on the side of the building and dragging him around to the back and then beating him more behind the building means that you meant to or you wanted to kill him? I could argue all of that.

"But I don't have to because Kim Crum took the stand and Kim Crum said on the stand, well, and from all the questions I was asking him, sounds like somebody planned on killing him or wanted to kill him. When I talked about changing the kinds of tools or weapons, the sharp force injury versus the blunt force injury, well, sounds like a plan. So I don't need to argue that. It's not disputed, it was premeditated."

The State urges us to consider the entire argument in context and find that it was "fair argument based entirely on the evidence adduced at trial." We disagree. Even if one could fairly characterize Crum's testimony as presenting a properly admitted lay opinion that the crime scene evidence showed the killing was premeditated, the issue of premeditation was not undisputed. Thus, the State still had to prove premeditation with the evidence and the jury had to find beyond a reasonable doubt that, based upon the facts of the case, the killing was premeditated. The prosecutor's statement that he need not argue why the facts established the element of premeditation because it was not in dispute exceeded the wide latitude afforded to prosecutors in discussing the evidence.

In the second step of the analysis, we would perceive the argument to be so fundamentally erroneous as to be gross and flagrant. Moreover, the combination of eliciting improper lay opinion testimony and then characterizing the somewhat equivocal responses as a stipulation to an element of the crime connotes ill will or such

misunderstanding of basic legal principles as to be tantamount to ill will.

Nevertheless, without our assessing witness credibility, we would have to declare the evidence of guilt in this case to be overwhelming. Moreover, the prosecutor also included proper argument on how the facts supported premeditation, and we do not perceive the question of premeditation to have been a close call for the jury. The critical issue for the jury was the identity of the attacker. Therefore, we find that the harmless error tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met.

## *PHOTOGRAPH EXHIBIT 22*

After opening statements and before the first witness, the State moved to admit a series of photographs, exhibits 1 through 22. The defense did not object, and the photographs were admitted. Exhibit 22 is a photograph of the top of a washing machine with its lid open, showing there is something inside and what appears to be blood on the machine.

The State did not display the photograph to any witness, and there was no testimony to explain the significance of the exhibit. Nevertheless, the photograph went with the jury when it retired to deliberate, along with all of the other properly admitted exhibits.

During deliberations, the jury asked questions about the photograph, seeking an explanation as to its significance. The trial court responded:

"THE COURT: . . . The first question is as follows: State's Exhibit No. 22, explain the significance. Is this blood on the washing machine? If so, was it tested? Was this machine at [Fainter's home]? Whose clothes are in the machine? The answer to all those questions is that I can't answer those, it was never testified to.

"There were a number of photographs that were preadmitted, this wasn't published during the trial, it wasn't testified to, it's for the jury to determine what weight and credit this exhibit gets. The instruction number one says you can consider as evidence testimony of witnesses, any admission of the parties and any exhibits which are admitted, of which this is 22.

"I don't know. I can't give you any guidance. This is—the weight and credit is for you to determine, but it was not testified to. And quite frankly, to answer any of those questions without any testimony would be speculation."

Crum states this issue as follows: "A photograph, exhibit 22, was mistakenly given to the jury during its deliberations. The exhibit purported to show a washing machine with cloth[e]s in the water and possible blood on the machine. The trial court's failure to properly respond to a jury question regarding the exhibit was reversible error." The answers to the stated issue are straightforward and simple.

First, the trial court admitted exhibit 22 into evidence without defense objection. We are not faced with a scenario where defense counsel stipulated to foundation conditioned upon the State later establishing relevance. The photograph was admitted as evidence, and at no time did the defense move to strike the exhibit or to have it withdrawn. As the jury instructions set forth, the jury was permitted to consider as evidence any exhibits which were admitted. Therefore, exhibit 22, being admitted by the court, was properly given to the jury to consider as evidence during its deliberations.

Then, when the jury questioned the significance of the exhibit, the district court answered in the only way that it could. The jury had been instructed that it was up to the jury to decide what weight and credit to assign the evidence, which would include an unexplained exhibit. Defense counsel did not object to the trial court's response to the jury question, perhaps because the district court was absolutely legally and factually correct with its answer.

Crum's overarching complaint is that the presence of the unexplained photograph permitted the jury to speculate that it supported an inference which was highly prejudicial to the defense. He asserts that the trial court should have, *sua sponte*, ordered the exhibit withdrawn and instructed the jury to disregard it. We decline the invitation to fashion such a legally unsupportable rule and find that the trial court did not err.

## SUBSTITUTE COUNSEL

Crum contends that the trial court violated his Sixth Amendment right to counsel by requiring him to proceed to trial while represented by an appointed counsel with whom he had developed a conflict. Crum filed a pro se motion for a change of counsel which was dated June 13, 2005, but file-stamped July 18, 2005. The trial

court considered the motion in pretrial proceedings on August 29, 2005.

Crum's complaints focused on his public defender's failure to spend more time with Crum and to keep Crum fully informed on the plan of defense. At the hearing, the district court explained that a great deal of work was required to prepare for trial which did not involve client consultations. Appointed counsel conceded that he had not spent a great deal of time meeting with Crum, principally because the facts of the case required that he spend his time elsewhere, such as reviewing reports and dealing with the investigator and witnesses. Nevertheless, appointed counsel declared that he was prepared to proceed to trial that day.

Shortly before the scheduled trial, Crum had attempted to retain private counsel, who apparently agreed to handle the case if the court would grant a continuance to permit the retained counsel to prepare for trial. According to Crum, one or more judges, other than the assigned trial judge, denied the retained attorney's attempts to enter the case and obtain a continuance.

At the time of the hearing, Crum focused on the situation with his retained counsel rather than on obtaining substitute appointed counsel. The trial judge offered to permit retained counsel to participate in the trial, alongside the appointed counsel, and unsuccessfully tried to locate the retained counsel on Crum's behalf. Thereafter, the trial proceeded with the original appointed counsel representing Crum.

On appeal, Crum complains that the delay in hearing his motion for new counsel was inexplicable; that the court should have inquired why appointed counsel did not take action on the pro se motion; that at the hearing the trial court should have given Crum the option to accept newly appointed counsel; that the court improperly threatened Crum that any new counsel would have to proceed to trial immediately; and that the trial court should have allowed Crum and defense counsel time to reconcile and overcome their communication problem.

We confess to some concern that the district court would delay for over a month in setting a hearing on a motion for new counsel, until the day of trial, and then declare that any new counsel would

be required to proceed immediately to trial. Likewise, any off-the-record denials of retained counsel's attempts to enter the case and obtain a continuance by judges other than the assigned trial judge strikes us as curious, at best. Nevertheless, we perceive that the assigned trial judge appropriately handled the last-minute request to substitute retained counsel and that the result on Crum's attempt to get new appointed counsel would have been the same with an earlier hearing date.

The State argues the three-part test from *State v. Saeger*, 13 Kan. App. 2d 723, 724-26, 779 P.2d 37 (1989), should be used as a framework for determining whether the trial court abused its discretion in failing to discharge a court-appointed attorney. However, that test has been supplanted by a "justifiable dissatisfaction" test.

"A trial court's refusal to appoint new trial counsel is reviewed using an abuse of discretion standard. Judicial discretion is abused when the district court's action is arbitrary, fanciful, or unreasonable. The test for abuse of judicial discretion is whether any reasonable person would take the view adopted by the district court. *State v. Jasper*, 269 Kan. 649, 653, 8 P.3d 708 (2000).

"To warrant the appointment of new trial counsel, a defendant must show 'justifiable dissatisfaction' with his or her appointed counsel. 'Justifiable dissatisfaction' may be demonstrated by showing a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the defendant and his or her appointed attorney. *Jasper*, 269 Kan. at 654." *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006).

When the district court addressed Crum's motion, it made inquiry of both Crum and his court-appointed attorney. See *State v. Taylor*, 266 Kan. 967, 979, 975 P.2d 1196 (1999) (citing *Wood v. Georgia*, 450 U.S. 261, 272, 67 L. Ed. 2d 220, 101 S. Ct. 1097 [1981]) (court has a duty to inquire when it becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony). The court elicited that the appointed counsel had expended time and energy in preparing for trial and was, in fact, ready to proceed. Crum's unilateral problem stemmed from a dissatisfaction with the amount of time and attention the appointed counsel devoted directly to Crum. An attorney's inability to shower as much personal attention upon a client as he or she would like does not necessarily rise to the level of a conflict of

interest. See *McGee*, 280 Kan. at 897 (disagreement about the amount of time and attention defendant should receive does not rise to the level of a conflict of interest).

In short, we find that Crum failed to establish a justifiable dissatisfaction with appointed counsel such that a denial of the motion to substitute counsel constituted an abuse of discretion.

## ADMISSION OF PHOTOGRAPH OF VICTIM

Crum complains about the admission of exhibit 41, which is a photograph of Neal's body at the crime scene, showing his face and upper chest and one arm, bent to reveal a bagged hand. Crum argues the photograph was more prejudicial than probative. We disagree.

Generally, when reviewing a district court's decision to admit photographs, an appellate court first determines whether the evidence is relevant, *i.e.*, probative. *State v. Sappington*, 285 Kan. 176, 194, 169 P.3d 1107 (2007); *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). The trial court has broad discretion regarding the admission of demonstrative photographs. To determine whether such photographs should be admitted, a trial court must decide whether they are relevant and whether a proper foundation has been laid. *State v. Kirby*, 272 Kan. 1170, 1186, 39 P.3d 1 (2002). Even though a defendant concedes the cause of death, the prosecutor still has the burden to prove all the elements of the crime charged. Therefore, photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Hernandez*, 284 Kan. 74, 102, 159 P.3d 950 (2007).

Crum principally argues that this particular photograph was cumulative to other admitted photographs and, therefore, was more prejudicial than probative. The district court had overruled the defense's objection to the exhibit, finding that this particular photograph revealed Neal's identity, in contrast to the autopsy photographs which depicted close-up views of the wounds. We have previously ruled that photographs may be admitted for purposes of identifying the victim. See *State v. Nguyen*, 281 Kan. 702, 728, 133 P.3d 1259 (2006) (not abuse of discretion to admit photograph

to identify the victim); see also *State v. Randol*, 212 Kan. 461, 466, 513 P.2d 248 (1973) (quoting *State v. Campbell*, 210 Kan. 265, 275-76, 500 P.2d 21 [1972]) (" 'Photographs admitted for the purpose of identifying the victim and to portray the facts described by a pathologist witness concerning the autopsy performed on the body of the victim are relevant and admissible.' ").

We find that the photograph labeled exhibit 41 was relevant and not unduly prejudicial. The district court did not abuse its discretion in admitting the exhibit.

## VIOLATIONS OF IN LIMINE ORDERS

Prior to trial, the district court granted Crum's motions to sequester the witnesses and to preclude the State from presenting evidence of his past crimes. Crum contends that both orders were violated and that he should have a new trial.

The courts employ

" 'a two-part test to evaluate alleged violations of [an order] in limine: (1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the defendant to show substantial prejudice. *State v. Galloway*, 268 Kan. 682, 692-93, 1 P.3d 844 (2000).' " *State v. Gleason*, 277 Kan. 624, 640, 88 P.3d 218 (2004) (quoting *State v. Douglas*, 274 Kan. 96, 109, 49 P.3d 446 [2002]).

The trial court is in the best position to decide if its order in limine was violated and determine the degree of prejudice a violation may have caused the defendant. *State v. Whitesell*, 270 Kan. 259, 281, 13 P.3d 887 (2000). The denial of a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Albright*, 283 Kan. 418, 425, 153 P.3d 497 (2007).

### Sequestration Order

Unbeknown to the parties, a witness, Jaimie Brown, was present in the courtroom prior to giving her own testimony. After learning of Brown's presence, Crum moved for a mistrial, claiming that Brown had observed most of the testimony of the first witness, Officer Robinson, and the first portion of Fainter's testimony. The district court observed that none of Officer Robinson's testimony involved Brown and that the observed portion of Fainter's testi-

mony did not describe any part of the event in which Brown was involved. Accordingly, the trial court denied the mistrial motion.

On appeal, Crum argues that Brown's presence during Fainter's testimony violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and his statutory rights under K.S.A. 22-2903. However, K.S.A. 22-2903 provides that sequestration is mandatory at preliminary hearings when requested by the defendant or the State. At trial, sequestration is not a right but is committed to the sound discretion of the trial court. *State v. Francis*, 282 Kan. 120, 142, 145 P.3d 48 (2006).

Moreover, the aim of sequestration is to "exercise a restraint on witnesses tailoring their testimony to that of earlier witnesses and aids in detecting testimony that is less than candid." *State v. Heath*, 264 Kan. 557, 589, 957 P.2d 449 (1998) (citing *Geders v. United States*, 425 U.S. 80, 87, 47 L. Ed. 2d 592, 96 S. Ct. 1330 [1976]). Crum does not, and we perceive that he cannot, point to any prejudice that he suffered as a result of Brown's brief violation of the sequestration order. Indeed, in closing argument, Crum's attorney emphasized that the versions of events related by the various State's witnesses were fraught with inconsistencies. The prevalence of inconsistencies would appear to be the antithesis of the "tailored" testimony which sequestration is designed to avoid. Thus, we find that the district court did not abuse its discretion in denying Crum's motion for a mistrial.

### In Limine Order

Crum claims that Spann violated the order in limine, which precluded any evidence of Crum's prior criminal record, by stating that "this time he'll go away for good." However, the citations to the record provided by Crum do not reflect that Spann made the statement attributed to her. Moreover, our review of Spann's entire testimony does not reveal that particular comment having been made. The burden is on Crum as the appellant, to furnish a record that affirmatively shows prejudicial error occurred in the trial court. Without such a record, an appellate court presumes the action of the trial court was proper and that no error occurred. See *State v. Goodson*, 281 Kan. 913, 919, 135 P.3d 1116 (2006).

Nevertheless, in addressing Crum's motion for a new trial, in which he made the same claim as here, the district court ruled that Crum had made no contemporaneous objection to the testimony and that the comment did not prejudice Crum. Both those rulings were appropriate.

When a motion in limine is granted to preclude the introduction of certain evidence at trial, the party who obtained the favorable ruling must object to evidence introduced in violation of the order. The failure to object results in the issue not being preserved on appeal. *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003).

Alternatively, even if the proffered comment was actually made by the witness and even if Crum had preserved the issue for appeal, we would find that the jury would not necessarily have to infer from the comment that Crum had a prior record and that the district court would not abuse its discretion in refusing to grant a mistrial for that rather innocuous testimony.

*CUMULATIVE ERROR*

Finally, Crum contends that the cumulative effect of the errors was to deny him a fair trial and that the inconsistencies in the testimony of the State's witnesses made the State's case a weak one. Our oft-cited description of the cumulative error analysis is:

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]' " *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2007) (quoting *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 [2006]).

Obviously, Crum did not have a perfect trial. However, our touchstone is the fairness of the trial and whether the cumulative effect of the trial errors had any likelihood of changing the result. Here, given the quantity and quality of the evidence presented, we are confident that the result would have been the same even without the trial errors.

Affirmed.