(219 P.3d 841)
Nos. 101,093
101,228

STATE OF KANSAS, *Appellee,* v. JON PAUL ULATE, *Appellant.*

972

Opinion filed November 20, 2009.

*Richard Ney*, of Ney, Adams & Sylvester, of Wichita, for appellant.

*Kristafer Ailslieger*, assistant solicitor general, and *Steve* Six, attorney general, for appellee.

Before MALONE, P.J., GREEN and MARQUARDT, JJ.

MALONE, J.: Jon Paul Ulate appeals his conviction of aggravated indecent liberties with a child. He raises numerous issues on appeal: (1) The district court erred by allowing the State's witnesses to testify that the victim had been sexually abused and that Ulate was the abuser; (2) the district court erred by allowing the State's expert witness to testify that she diagnosed the victim with post-traumatic stress disorder (PTSD); (3) the district court violated Ulate's right to a public trial under the Sixth Amendment to the United States Constitution by excluding his family from the courtroom during the victim's testimony; (4) the district court erred by denying Ulate's motion for a mistrial; (5) the district court erred by allowing the State to admit evidence of Ulate's bad character; (6) Ulate was denied a fair trial based on prosecutorial misconduct during closing argument; (7) there was insufficient evidence to support Ulate's conviction; and (8) Ulate was denied a fair trial based on cumulative error.

In February 2004, Ulate moved to Kansas to live with his half-brother Jeremy. Ulate was 16 years old at the time. Before moving to Kansas, Ulate lived in New Mexico with his parents, Judy and Oscar Ulate. In Kansas, Ulate resided with Jeremy, Jeremy's wife, Elonda, and their two daughters, K.B. and J.B., aged 10 and 7 respectively. Although J.B. was initially excited when Ulate came to live with the family, Jeremy and Elonda noticed a change in J.B.'s behavior towards Ulate over time.

In January 2006, Ulate left Jeremy's residence and returned to New Mexico to live with his parents. J.B. did not see Ulate again until Thanksgiving 2006 when she traveled with her family to New Mexico to visit Judy and Oscar. During her visit to New Mexico, J.B. voluntarily hugged Ulate.

In March 2007, J.B. approached her mother Elonda and told her that Ulate had "humped" her several times while he had been living with the family. The following day, Elonda contacted Sumner County Sheriff's Detective Frances Stevenson and reported J.B.'s allegations. Stevenson arranged for Jane Holzrichter at Horizons Mental Health Center to interview J.B. During Holzrichter's videotaped interview, J.B. described the last time that Ulate had humped her. J.B. had been in her room in bed, and Ulate came into her room. Ulate took J.B. to his room where he removed her clothing and rubbed his penis on her vagina. J.B. told Ulate to stop, but he did not stop. Ulate later told J.B. that if she told anyone about the incident he would cut her with a knife. J.B. was unsure when the incident had occurred, but she thought that it might have been in the summer or when it was hot. J.B. also described an earlier incident of humping that occurred while she was watching a movie.

In May 2007, Stevenson interviewed J.B. During the interview, J.B. clarified that the last time Ulate had humped her had occurred around Thanksgiving when the Dallas Cowboys played the Denver Broncos, not during the summer. J.B. also stated that the movie she had been watching during the other incident she had described to Holzrichter was "The Incredibles."

On January 23, 2008, the State charged Ulate with two counts of aggravated indecent liberties with a child. At trial, J.B., Jeremy, Elonda, Stevenson, Holzrichter, and J.B.'s therapist, Mary Hotze, testified for the State. Ulate testified in his own defense and denied all of J.B.'s allegations. Ulate also called eight friends and family members who had been present at the 2006 Thanksgiving visit in New Mexico to testify on his behalf, including his parents Judy and Oscar. The friends and family members testified that J.B. seemed normal and happy at that time and that she willingly hugged Ulate.

The jury found Ulate guilty of both counts of aggravated indecent liberties with a child. The district court subsequently dismissed the first count for lack of jurisdiction because the State failed to prove that Ulate was an adult when he committed the crime. The district court sentenced Ulate to 71 months' imprisonment. Ulate timely appealed his conviction.

### Therapist's testimony

We will address Ulate's first two issues together because both issues focus on the testimony of Hotze, J.B.'s therapist. Ulate first claims that Hotze improperly testified at trial that J.B. had been sexually abused and that Ulate was the abuser. Ulate asserts that Hotze's testimony improperly commented on J.B.'s credibility, which invaded the factfinding province of the jury.

Generally, the admission of expert testimony lies within the sound discretion of the district court, and the district court's decision will not be overturned absent an abuse of such discretion. *State v. Johnson*, 286 Kan. 824, 831, 190 P.3d 207 (2008). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the district court, an appellate court will not conclude that the district court abused its discretion. *State v. Johnson*, 33 Kan. App. 2d 490, 494, 106 P.3d 65 (2004).

Here, before the trial, Ulate filed a motion to exclude Hotze's testimony. Ulate's motion asserted that Hotze's testimony would require her to pass on the credibility of J.B. as a witness and to express an opinion about Ulate's guilt. The district court ruled that Hotze may not testify to the ultimate issue of whether Ulate sexually abused J.B. However, the district court ruled that Hotze may state an opinion that the symptoms J.B. alleged were consistent with sexual abuse. When Hotze testified at trial, Ulate's defense counsel stated that he wanted to "renew my pretrial motion." The district court granted Ulate a continuing objection on this ground.

Generally, an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d). However, an expert witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material

in evidence. An expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury. *State v. Torres*, 280 Kan. 309, 334, 121 P.3d 429 (2005). In regard to the more specific expert witness issue presented in this case, the Kansas Supreme Court has held that a qualified expert witness may testify about common patterns of behavior exhibited by sexually abused children and that a particular victim exhibited behavior consistent with a sexually abused child. See *State v. McIntosh*, 274 Kan. 939, 955-60, 58 P.3d 716 (2002).

Here, the State asked Hotze, "And in your education, training, and experience as a therapist, are there certain characteristics that are exhibited by an individual recognized by studies and others in the profession that are indicative of sexual abuse?" Hotze answered:

"Children who have been sexually abused do display a certain number of characteristics. There's generally anxiety, hypervigilance. [J.B.] displayed what we call damaged goods syndrome where she didn't want to tell anybody because she was afraid she wouldn't be loved anymore. Sometimes people experience that for the rest of their lives. There's low self-esteem. There's fear. There's nightmares. Trying to think if I'm covering everything. Sometimes there's kind of role confusion or they have difficulty with boundaries. And there's a time when [J.B.] came in and she would almost take on the role of being an adult and would—we call it . . . pseudo-maturity. And she displayed some of those characteristics as well."

The State then asked Hotze, "And the certain characteristics that you had previously talked about, did [J.B.] meet any of those?" Hotze answered that J.B. had exhibited several similar characteristics: "The damaged goods syndrome of being afraid to tell her mom, anxiety, reporting nightmares, certainly fearful. She also— this is mom's description of she started wetting the bed again, so that would be regression."

The State also asked Hotze what information she had about J.B. when she came to her office for the first session. Hotze explained she had a referral sheet and she had talked to Elonda about the allegations of sexual abuse. Hotze then explained her approach to J.B.'s treatment: "I decided fairly early on when there had been a forensic interview, and when something like this goes to court, it wasn't my job to be an investigator. It was my job to help this girl

heal whatever way I could." Hotze also explained she told J.B. on her first visit that "[she] understood what had happened to her" because she wanted J.B. to know that "she could tell me whatever she wanted whenever she wanted to."

Contrary to Ulate's assertions, Hotze's statements were not improper comments on J.B.'s credibility. Hotze testified about common patterns exhibited by sexually abused children and that J.B. exhibited behavior consistent with a sexually abused child. Hotze did not testify that she believed J.B.'s allegations, and she did not give an opinion that Ulate was the abuser. Hotze's testimony that she told J.B. that "[she] understood what had happened to her" was offered only to explain her approach to J.B.'s treatment. We conclude that Hotze's opinion testimony was within the parameters allowed by the Kansas Supreme Court in *McIntosh*. Her testimony did not constitute improper commentary on the credibility of J.B. or express an opinion about Ulate's guilt.

Ulate also argues that Detective Stevenson improperly commented on his guilt. At trial, the State asked Stevenson if there was any indication that anyone other than Ulate had committed the sex acts against J.B. Stevenson replied in the negative and testified that she would have investigated any allegations against another suspect. Ulate maintains that Stevenson's testimony constituted an improper comment on her belief that Ulate was guilty.

However, Ulate did not specifically object to this testimony at trial. Ulate objected to the district court permitting Stevenson to testify *at all* because the State had not provided him with Stevenson's report prior to trial. Ulate did not object during Stevenson's testimony explaining why she did not investigate other suspects. An objection to the admission or exclusion of evidence must be timely and specific to preserve the issue for appellate review. *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009); see K.S.A. 60-404. A party may not object at trial to the admission or exclusion of evidence on one ground and then argue a different ground on appeal. *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005). Thus, Ulate failed to properly preserve the issue concerning Stevenson's testimony that there were no other suspects.

Next, Ulate argues that the record does not establish that Hotze had the requisite qualifications under K.S.A. 65-6404(b)(3) to render a PTSD diagnosis. Ulate also argues that Hotze's single 40-minute interview of Elonda did not provide sufficient foundation to admit her testimony regarding her diagnosis of J.B. having PTSD.

The State argues that Ulate failed to preserve this issue for appeal. Ulate had filed a pretrial motion to exclude Hotze's testimony on the specific ground that her testimony required her to pass on J.B.'s credibility as a witness and express an opinion about Ulate's guilt. Ulate renewed his pretrial motion at trial, and the district court granted Ulate a continuing objection on that ground. However, the pretrial motion raised no objection as to Hotze's qualifications or the lack of foundation to admit her testimony regarding her diagnosis of J.B. having PTSD.

At trial, when the prosecutor initially asked Hotze to render her diagnosis of J.B., Ulate objected on the ground that an insufficient foundation had been laid for Hotze's diagnosis. This objection was necessary and appropriate because Ulate's pretrial motion and his continuing objection about Hotze's testimony did not cover this ground. The district court excused the jury, and Ulate clarified his objection to be that an insufficient foundation had been laid whether the PTSD diagnosis was generally accepted within the scientific community based on the *Frye* test. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The district court sustained this objection and ruled that the State would need to lay more foundation as to whether PTSD was generally recognized in the mental health field and whether the DSM-IV was a generally recognized diagnostic tool. The jury returned to the courtroom, and the prosecutor proceeded to lay the additional foundation as directed by the district court. When the prosecutor again asked Hotze for her diagnosis, she answered that she diagnosed J.B. with PTSD, without objection from the defense.

As we have previously stated, a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review. The Kansas Supreme Court stressed the importance of this legislative mandate in

*King,* 288 Kan. at 349 ("From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal."). Here, when Ulate initially objected to Hotze's diagnosis based on lack of foundation, the district court sustained the objection and required the State to lay additional foundation. The prosecutor laid additional foundation; when the prosecutor again asked Hotze for her diagnosis, the testimony was admitted without objection from the defense. Thus, we must conclude that Ulate failed to properly preserve any objection concerning whether Hotze possessed the requisite qualifications to render a PTSD diagnosis or spent enough time with J.B. to arrive at the diagnosis.

Even if this issue had been properly preserved for appeal, any error committed by the district court in admitting the evidence would be subject to the harmless error rule. When an appellate court concludes that a district court erroneously admitted or excluded evidence at trial, the appellate court must then determine whether the error was harmless, *i.e.*, whether the evidence admitted or excluded had any likelihood of changing the results at trial. *State v. Boggs,* 287 Kan. 298, 318-19, 197 P.3d 441 (2008); see K.S.A. 60-261. To determine whether trial errors are harmless or prejudicial, each case must be scrutinized in the light of the record as a whole, and reversal is required only where an erroneous admission or exclusion of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice. *State v. Garcia,* 282 Kan. 252, 270, 144 P.3d 684 (2006).

In addition to Hotze's testimony regarding her PTSD diagnosis, Hotze also testified about common patterns exhibited by sexually abused children and that J.B. exhibited behavior consistent with a sexually abused child. The State's other evidence at trial consisted of J.B.'s testimony, Holzrichter's testimony regarding her interview of J.B., Stevenson's testimony regarding her interview of J.B., and J.B.'s parents' testimony concerning her behavior before and after Ulate resided in their home. J.B.'s live testimony and her videotaped interview, which was also played at the trial, were substan-

tially consistent and compelling. We conclude that any error in the admission of Hotze's testimony regarding her PTSD diagnosis did not affect the outcome of the trial and did not deny Ulate substantial justice. Therefore, even if this issue had been properly preserved for appeal, any error in the admission of the evidence was harmless.

### Sixth Amendment right to public trial

Ulate argues that his right to a public trial under the Sixth Amendment to the United States Constitution was violated when the district court excluded his family members from the courtroom during J.B.'s testimony. The State counters that Ulate failed to preserve this issue for appeal and that if the issue was preserved for appeal, Ulate's argument is better characterized as a sequestration issue than a Sixth Amendment issue.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The determination of whether a defendant's Sixth Amendment right to a public trial was violated is a question of law over which an appellate court has unlimited review. *State v. Dixon*, 279 Kan. 563, 596, 112 P.3d 883 (2005).

This issue arose at Ulate's trial when the State asked the district court to sequester all witnesses except the case Detective Stevenson. Ulate's counsel did not object to the State's request to sequester witnesses, except defense counsel wanted the sequestration order to also apply to Stevenson. The district court initially denied the request for sequestration and indicated that all witnesses would be allowed to remain in the courtroom. The prosecutor then asked the district court to reconsider the sequestration of witnesses during J.B.'s testimony. The prosecutor noted J.B.'s fear and her concern about the intimidation of other relatives and stated it would be less traumatic for J.B. to testify without the family members in the courtroom. The district judge reconsidered its ruling and stated, "I think that's fair. If there are any *witnesses* [present] during the child's testimony, I will order sequestration at that time." (Emphasis added.) Ulate raised no objection to the

district court's order sequestering witnesses during J.B.'s testimony.

Ulate concedes that he did not lodge a specific Sixth Amendment objection to the exclusion of witnesses during J.B.'s testimony. However, he cites *Dixon* to support his position that the issue can be raised for the first time on appeal. In *Dixon*, the Kansas Supreme Court acknowledged that defense counsel had only objected to closure of the courtroom based on the First Amendment, not on the Sixth Amendment. Nevertheless, the court addressed the defendant's Sixth Amendment issue on appeal. See 279 Kan. at 596-97.

Generally, issues not raised before the district court cannot be raised on appeal. *State v. Gant*, 288 Kan. 76, 82, 201 P.3d 673 (2009) (constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent a denial of fundamental rights; and (3) the judgment of the district court may be upheld on appeal even though that court may have relied on the wrong ground or assigned a wrong reason for its decision. *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008). However, these exceptions do not apply to issues concerning the admission or exclusion of evidence for which a contemporaneous objection is required. *King*, 288 Kan. at 349.

Ulate does not assert any of the recognized exceptions to the general rule that a new legal theory may not be raised for the first time on appeal. However, "[o]ne of the fundamental rights of a criminal defendant is his right to a public trial." *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986). Given our Supreme Court's recognition of the right to a public trial as a fundamental right, we will apply the second *Hawkins* exception, *i.e.*, consideration of the theory is necessary to serve the ends of justice or to

prevent a denial of fundamental rights, and we will address the merits of Ulate's Sixth Amendment public trial issue.

The United States Supreme Court addressed the Sixth Amendment public trial guarantee in *Waller v. Georgia*, 467 U.S. 39, 81 L. Ed. 2d 31, 104 S. Ct. 2210 (1984). In *Waller*, the petitioners' were charged with running an illegal lottery operation, and their suppression hearing was closed to the public when the district court found that evidence obtained under wiretaps would "involve" the privacy interests of persons who were not then indicted. The Supreme Court ultimately determined that an accused's constitutional right to a public trial applied to a suppression hearing. See 467 U.S. at 43, 45-50. The Court held that under the Sixth Amendment, any closure of a courtroom in a criminal proceeding over the objection of the accused must meet the following tests: The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest; the district court must consider reasonable alternatives to closing the hearing; and the district court must make adequate findings to support the closure. 467 U.S. at 48.

The Court applied the tests to the case before it and held that the district court's findings in closing the suppression hearing were broad and general and did not justify closure of the entire hearing. Furthermore, the Court found that the district court had not considered alternatives to immediate closure of the hearing. 467 U.S. at 48. To remedy the error, the Court ordered a new suppression hearing and directed the district court to apply the appropriate tests in deciding what portions of the hearing, if any, should be closed to the public. The Court stated that a new trial need be held only if a new public suppression hearing resulted in the suppression of material evidence not suppressed at the first trial. 467 U.S. at 49-50.

The Kansas Supreme Court addressed the Sixth Amendment right to a public trial in *Dixon* where the defendant, Wallace Dixon, was on trial for two counts of felony murder among other charges. His coconspirator, Ethan Griffin, faced similar charges. Because Lyon County had only one prosecution team, Dixon was scheduled

to be tried first and Griffin second. The jury for Griffin's trial completed voir dire but had not yet been sworn and impaneled for trial before the jury in Dixon's case reached its verdicts. To prevent the Griffin jury from being tainted by information about the Dixon verdicts, the district court closed the courtroom to media and spectators before reading the Dixon jury's verdicts. Only the defendant, court staff, the attorneys involved in the case, and the victim's parents were allowed in the courtroom.

On appeal, the court held that the district court violated Dixon's constitutional right to a public trial by closing the courtroom for the reading of the verdicts. The court reasoned that the presumption of openness in a criminal trial may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The court found that the interest supporting closure is to be articulated by the district court, along with findings specific enough that a reviewing court can determine whether the closure was properly entered. Because the error was of constitutional magnitude and inconsistent with Dixon's substantial right to a public trial, the court found the error was not harmless. 279 Kan. at 599-601.

Ulate's case is distinguishable from *Waller*, *Dixon*, and all other cases cited by Ulate discussing the Sixth Amendment right to a public trial. In Ulate's case, the issue about excluding anyone from the courtroom was raised in the context of the State's request to sequester witnesses. The district court denied the request to sequester witnesses except during J.B.'s testimony. However, the district court never closed any portion of the trial proceedings to the public. The district court never even closed any portion of the trial proceedings to members of Ulate's family except to the extent that they were witnesses. Members of Ulate's family who were not going to testify as witnesses were not ordered to leave the courtroom at any time. The district court's only order was to sequester witnesses during J.B.'s testimony. Specifically, the judge ordered, "If there are any *witnesses* [present] during the child's testimony, I will order sequestration at that time." (Emphasis added.)

The district court's sequestration order applied to the State's witnesses as well as defense witnesses. Every sequestration order

necessarily involves the exclusion of witnesses from the courtroom. However, Ulate has cited no cases where any court has ever held that a sequestration order as to witnesses amounted to a violation of the defendant's right to a public trial. We agree with the State that Ulate's argument is better characterized as a sequestration issue than a Sixth Amendment issue.

The sequestration of witnesses at trial is not a right but is committed to the sound discretion of the district court. In the absence of evidence that a sequestration order prejudiced the defendant, the district court's decision will not be reversed on appeal. *State v. Heath,* 264 Kan. 557, 588-89, 957 P.2d 449 (1998). The primary aim of a sequestration order is to prevent witnesses from tailoring their testimony to that of earlier witnesses. *State v. Crum,* 286 Kan. 145, 161, 184 P.3d 222 (2008).

In Ulate's case, the district court's sequestration order seemed to be aimed more toward protecting J.B.'s privacy rather than preventing the witnesses from tailoring their testimony. However, even if the district court's order may not have served the usual purpose of a sequestration order, the ruling will not result in reversible error unless Ulate can show prejudice. See *Heath,* 264 Kan. at 588-89. Here, Ulate is unable to show how he was prejudiced by the district court's order sequestering witnesses during J.B.'s testimony. J.B.'s trial testimony was substantially consistent with her pretrial statements to Holzrichter and Stevenson. Thus, we conclude the district court did not commit reversible error by sequestering the witnesses during J.B.'s testimony, and the district court's sequestration order did not violate Ulate's constitutional right to a public trial.

### Motion for mistrial

Ulate next argues that the district court erred by denying his motion for a mistrial. The district court may grant a mistrial when prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution. K.S.A. 22-3423. A motion for mistrial is reviewed under an abuse of discretion standard. The party alleging the abuse bears the burden of proving that his or her sub-

stantial rights to a fair trial were prejudiced. *State v. Albright*, 283 Kan. 418, 425-26, 153 P.3d 497 (2007); see K.S.A. 22-3423(1).

Late in the trial, while evidence was being presented, Stevenson noticed Oscar Ulate making threatening faces at J.B.'s father, Jeremy, while both family members were seated in the gallery. Stevenson walked towards the exit, stopped briefly next to Oscar, and whispered something to the effect of "you need to stop that." According to Oscar, Stevenson pointed a finger in his face. Stevenson then left the courtroom, and Oscar followed her outside for further discussion.

Upon learning of the incident, defense counsel moved for a mistrial on the grounds that the jury might have seen the incident and been prejudiced. Defense counsel admitted that he had no evidence that the jury had seen anything. The trial judge noted that he had not heard or seen anything, nor had he observed any of the jurors become distracted by anything during the trial. The judge noted that he was seated facing the jury the entire time and he observed the jurors watching the witnesses and taking notes. The judge denied the motion for mistrial at that time, but he allowed the defense to call witnesses on the matter and the motion was renewed at a later time.

While the jury was deliberating, the district court held a hearing on the motion for mistrial. Both Oscar and Stevenson testified at the hearing. Oscar testified that his encounter with Stevenson was brief, not loud, and he did not see if any of the jurors saw the incident. Stevenson testified that she whispered her comment as she walked by Oscar on her way out the courtroom. Upon questioning by the judge, the defense attorneys and the prosecutor admitted they did not hear or see the incident. The judge again noted that the incident was not distracting enough to catch his attention and that he never observed any of the jurors being distracted at the hearing. The judge further stated the evidence confirmed his belief that the encounter between Stevenson and Oscar was a brief incident that did not affect the outcome of the proceedings. Accordingly, the judge again denied the motion for mistrial.

Finally, after the verdicts had been read, defense counsel renewed his motion for mistrial. He asked the judge to inquire if any of the jurors "saw the interaction we discussed yesterday," referring to the incident between Stevenson and Oscar. The judge asked the jurors, "Was anybody influenced by anything that occurred in the courtroom in their decision that wasn't coming from the witness stand?" Upon receiving no response, the judge again denied a mistrial and discharged the jury.

Ulate cites *State v. Dayhuff*, 37 Kan. App. 2d 779, 158 P.3d 330 (2007), to support his argument that the district court erred in denying his motion for a mistrial. In *Dayhuff*, the defendant was charged with aggravated indecent liberties with a child. During the trial, a courtroom spectator observed a child-victim advocate essentially coaching the victim by using gestures while the victim testified. Defense counsel moved for a mistrial and requested a hearing on the matter to develop a factual basis. The district court denied both requests. Although the district court held an evidentiary hearing 7 months after the trial, even then the district court never ruled on the effect the incident had on the trial. On appeal, the court held that the district court erred in denying the motion for mistrial, ruling that the district court never exercised its discretion as to whether the conduct prejudiced the defendant. See 37 Kan. App. 2d at 796-801.

Ulate's case is distinguishable from *Dayhuff*. In *Dayhuff*, the district court denied the defendant's motion for mistrial without investigating the witness-coaching incident and without conducting an evidentiary hearing to allow the defendant to develop a factual basis. Here, the district court held an evidentiary hearing concerning the incident between Stevenson and Oscar. The district court investigated the incident, considered the evidence, arguments of counsel, and its own observations and rendered a reasoned decision that was neither arbitrary, fanciful, nor unreasonable. Ulate argues that it would have been better for the trial judge to have specifically inquired whether any of the jurors heard or observed Stevenson admonish Oscar. While that may be true, it is important to note that defense counsel never requested the judge to question the jury about the incident until after the verdicts had been read. We

conclude that the district court did not abuse its discretion in denying Ulate's motion for a mistrial.

## Character evidence

Next, Ulate argues that the district court abused its discretion by allowing inadmissible and highly prejudicial character evidence at trial. The State argues that Ulate opened the door at trial for the admission of the character evidence.

When a defendant opens an otherwise inadmissible area of evidence during examination of witnesses, the prosecution may then present evidence in that formerly forbidden sphere. *State v. Drayton*, 285 Kan. 689, 699-700, 175 P.3d 861 (2008). Rebuttal evidence contradicts evidence introduced by an opposing party. The use and extent of rebuttal evidence rests in the sound discretion of the district court. The erroneous admission of rebuttal evidence is not grounds for reversal unless discretion has been abused to the defendant's prejudice. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *State v. Johnson*, 33 Kan. App. 2d 490, 494, 106 P.3d 65 (2004).

Prior to trial, Ulate filed a motion in limine and requested the district court to exclude any evidence of Ulate's prior record and certain bad character evidence. In particular, the motion sought to exclude evidence of Ulate's behavioral problems with his father in New Mexico and behavioral problems Ulate exhibited after he moved to Kansas. The district court granted Ulate's motion.

At trial, during cross-examination of J.B.'s father, Jeremy, defense counsel asked whether he had any concerns about Ulate when he moved in with the family:

"Q. Okay. And you allowed your brother, Jon Paul, to move in with you in 2004?
"A. Correct.
"Q. And you had no concerns whatsoever about him at that time?
"A. Specify concerns.
"Q. Well, you didn't worry about him being with your daughters?
"A. No I did not.
"Q. Had no concerns whatsoever about that?
"A. Just the music and his language."

The State subsequently argued that defense counsel had opened the door to the previously excluded evidence about Ulate's behavioral problems, and the district court agreed. The State was allowed to recall Jeremy to the witness stand. Jeremy testified that he had problems with Ulate's language around the children and the fact that he stayed up all night listening to rap music. Jeremy also testified that he asked Ulate to leave his home in January 2006 because of these problems. Later, during the State's cross-examination of Judy Ulate, the prosecutor asked her about the troubled relationship between Ulate and his father. Specifically, the prosecutor asked Judy about Ulate running away from home, acting out of control, and fighting with his father.

This testimony was allowed only after defense counsel asked Jeremy if he had any "[any] concerns whatsoever about [Ulate]" when he moved into his home. We are unwilling to conclude that the district court abused its discretion by finding that Ulate opened the door to the previously excluded evidence. More importantly, the additional evidence that was admitted after the district court ruled the door had been opened was not highly prejudicial to Ulate's case. Any error in the admission of this evidence was harmless considering the totality of the evidence presented at trial.

Ulate also complains about the prosecutor asking Judy a question about whether Ulate "ran off with a young girl in Sumner County." Ulate is correct in asserting that he did *not* open the door to this question. However, as Ulate concedes, defense counsel objected to the question, and the district court sustained the objection. A jury will be presumed to have disregarded evidence about which an objection was sustained. *State v. Rice*, 261 Kan. 567, 592-93, 932 P.2d 981 (1997).

### Prosecutorial misconduct

Ulate next argues that the prosecutor's statements during closing arguments constituted prosecutorial misconduct and, as a result, his convictions should be reversed. Specifically, Ulate claims that the prosecutor vouched for the credibility of Hotze and Holzrichter in statements made during the closing arguments.

Ulate did not object to the alleged prosecutorial misconduct at trial. However, a claim of prosecutorial misconduct based on comments made during voir dire, opening statement, or closing argument, which are not evidence, will be reviewed on appeal even when a contemporaneous objection was not made at trial. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

In the second step of the two-step analysis, the appellate court considers three factors:

" '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met.' [Citations omitted.]" 288 Kan. at 323.

Ulate's first claim of prosecutorial error involves the prosecutor's factual description of the events constituting Count I, referred to as "The Incredibles" incident, and the prosecutor's statement that J.B. cried when she spoke about the movie "The Incredibles" because it reminded her of what Ulate had done to her. However, as the State correctly points out, the prosecutor's alleged misstatements in reference to "The Incredibles" incident are moot because the district court dismissed the first count for lack of jurisdiction following the jury's guilty verdicts.

Ulate's next claim of error is that the prosecutor vouched for the credibility of Hotze and Holzrichter by improperly speculating as to the motivations of the witnesses. In the concluding remarks of her closing arguments, the prosecutor stated:

"What's the possible motivation for these people to go to all of this? This year long investigation. This trial. Putting this little girl on the stand. . . . Because she alleged it, and she gave the details, and the experts investigated this case, and we put it to you. And it's your decision and your decision alone, ladies and gentlemen, to determine whether or not the defendant committed these crimes."

We conclude that the prosecutor's comments were within the wide latitude that the prosecutor is allowed in discussing the evidence. Even if the comments did improperly speculate on the motivations of the witnesses, no prejudicial error occurs where the questionable statements by a prosecutor are provoked and made in response to prior statements made by defense counsel. *McReynolds*, 288 Kan. at 325. Here, the prosecutor's questioned statements were made during the State's rebuttal and were in response to defense counsel's statements during his closing arguments that the State's witnesses "were all clearly motivated to get a prosecution. They didn't care about the truth. They disregarded the truth. They weren't going to investigate anything that didn't go to the guilt of the defendant." The prosecutor had the right to respond to defense counsel's attack on the credibility of the State's witnesses. We find no prosecutorial misconduct.

### Sufficiency of the evidence

Ulate contends that the State presented insufficient evidence at trial to support his criminal conviction. Ulate characterizes J.B.'s testimony as the only evidence supporting the jury's guilty verdict, and he argues that her testimony was inconsistent and uncorroborated.

"When a defendant challenges the sufficiency of the evidence in a criminal case, the standard of review is whether after reviewing all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009).

J.B. testified that the last time Ulate "humped" her was around the time that she watched a football game near Thanksgiving between the Denver Broncos and the Dallas Cowboys. J.B. was in bed asleep when Ulate came into her room. Ulate took J.B. to his room and put her on the bed. Ulate was wearing nothing but boxer shorts. He took J.B.'s underwear off and put his penis on her bottom. J.B. told Ulate to stop, and he replied, "Just a few more minutes." J.B. testified that Ulate told her he would hurt her if she told what had happened. This testimony was offered by the State to support Count II of the complaint against Ulate for aggravated indecent liberties with a child.

The testimony of the victim alone is sufficient to support a conviction. *State v. Matlock*, 233 Kan. 1, 3, 660 P.2d 945 (1983). Moreover, J.B.'s testimony was corroborated by the testimony of Stevenson and Holzrichter, who interviewed J.B. about her allegations against Ulate. The State played a video of Holzrichter interviewing J.B., in which J.B. described what happened the last time Ulate "humped" her. In addition, J.B.'s mother and father testified that they noticed changes in J.B.'s behavior after Ulate had lived with them. Lastly, Hotze testified that J.B. exhibited characteristics similar to children who had experienced sexual abuse.

This court will not reassess the weight and credibility of the evidence presented at trial. *State v. Murray*, 285 Kan. 503, 540, 174 P.3d 407 (2008). Viewing the evidence in the light most favorable to the State, there is sufficient evidence to convince this court that a rational factfinder could have found Ulate guilty of aggravated indecent liberties with a child.

*Cumulative error*

In his last issue, Ulate argues that he was denied a fair trial based on cumulative error.

"Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative error rule if the evidence is overwhelming against a defendant. [Citation omitted.]" *State v. Hoffman*, 288 Kan. 100, 109-10, 200 P.3d 1254 (2009).

Here, the only issue which may have resulted in an error was the district court's decision to sequester witnesses during J.B.'s testimony. As we have held, this error did not violate Ulate's constitutional right to a public trial. One error alone is insufficient to support reversal under the cumulative error rule. *Hoffman*, 288 Kan. at 110. "This, like many criminal trials, was a difficult one, but as we have often said, an accused is entitled to a fair trial, not a perfect one. [Citation omitted.]" *State v. Broyles*, 272 Kan. 823, 842, 36 P.3d 259 (2001). Ulate is not entitled to a new trial based on cumulative error.

Affirmed.